

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP - 8 2010

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WILLIAM ALEX QUIGLEY,           §
        PLAINTIFF,              §
                               §
VS.                            §    CIVIL ACTION NO. 4:09-CV-402-A
                               §
MICHAEL J. ASTRUE,             §
COMMISSIONER OF SOCIAL SECURITY, §
        DEFENDANT.             §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I. STATEMENT OF THE CASE

The plaintiff, William Alex Quigley ("Quigley"), filed an application for Title II

disability insurance benefits ("DIB") on May 7, 2007, claiming that he had been disabled due to

chronic seizures since March 15, 2006.  (Transcript ("Tr.") 28, 55, 84.)[1]  That application was

denied on June 16, 2007, and again on reconsideration.  (Tr. 55, 60.)  Quigley timely requested a

hearing before an administrative law judge ("ALJ"), and a hearing was held in Fort Worth, Texas

before ALJ Jack Raines on July 8, 2008.  (Tr. 28.)

---

[1] The relevant time period for Quigley's DIB application is March 15, 2006, his alleged onset date, through
June 30, 2012, his last insured date.  (Tr. 28); *see* 20 C.F.R. § 404.131.

1

On September 18, 2008, the ALJ issued a decision finding that he was not disabled. (Tr. 11-20.) The Appeals Council denied Quigley's request for review on June 8, 2009. (Tr. 1-3.) Quigley subsequently filed the instant action in this Court on July 10, 2009.

## II. STANDARD OF REVIEW

The Social Security Act ("SSA") defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. § 404.1520(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work,

considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley,* 197 F.3d at 198; *see also Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994). If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002). A denial of benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000). The Court must, however, carefully scrutinize the record to determine if the evidence is present.

III. ISSUES[2]

Quigley presents the following issues:

1. Whether the ALJ's RFC assessment that Quigley had no communicative limitations is supported by substantial evidence.

2. Whether the ALJ's determination that Quigley can perform his past relevant work is supported by substantial evidence.

IV. ADMINISTRATIVE RECORD

A. Background and Vocational History

Quigley was born on November 4, 1970, and he completed the eleventh grade. (Tr. 32, 92.) His past relevant work included jobs as a men's clothing salesperson, a furniture mover, an automobile salesperson, a forklift operator, and a dairy department manager. (Tr. 44-45.)

B. Relevant Treatment History[3]

Quigley was referred to neurologist J.P. Liu, M.D., ("Liu") for dizziness and possible seizure activity in February 2004. (Tr. 176.) Liu continued to treat Quigley for his seizures through January 2008. (See Tr. 151-83, 208.) At each of Quigley's eleven visits, Liu performed neurological examinations, consistently noting that Quigley was alert and oriented, had fluent speech, and had no deficits in comprehension or naming repetition. (Tr. 152, 169, 173-75, 177, 180-83, 208.) During his April 2007 visit to Liu, Quigley reported symptoms of depression, stating that he felt fatigued and hopeless. (Tr. 180.) Liu then prescribed Quigley 37.5 milligrams

_____

[2] The Court notes that Quigley, in his brief, specifically sets forth one issue with two subparts to be considered by the Court. (See Pl.'s Brief ("Pl.'s Br.") at 1. However, the actual briefing makes it very difficult for the Court to identify exactly what issues are being raised and to properly address such issues. (See, e.g., Pl. Br. at 4-6.) The Court has endeavored to address all of Quigley's issues herein.

[3] Because Quigley's arguments in his brief solely concern his mental impairments, the Court will review only the medical evidence related to such impairments.

of Effexor per day for his depression, with plans to increase the dosage to 75 milligrams per day if Quigley tolerated the initial dose. (*Id.*)

Clinical psychologist Steven Greer, Ph.D., ("Greer") performed a consultative neuropsychological examination of Quigley on May 25, 2007 and June 2, 2007. (*See* Tr. 185-92.) Greer noted that Quigley's background information offered "no compelling reason to infer any additional neuropsychological deficit beyond the focal neuropsychological injury, probably a birth injury, implied in [Quigley's] idiopathic epilepsy designation." (Tr. 186.) Green indicated that the examination was suggested by Quigley's vocational rehabilitation counselor, who felt Quigley's goal of opening a men's clothing store was unrealistic and wanted to obtain general data regarding Quigley's ability, personality, and neuropsychological status to help with his vocational planning. (*Id.*)

In his behavioral observations, Greer noted that Quigley had a limited vocabulary and expressive range. (*Id.*) Greer also commented that Quigley was "clearly oriented . . . , socially appropriate, and seemingly capable of social judgment, but for his aspirations to be his own business owner." (*Id.*) With regard to Quigley's pertinent social history, Greer reported that Quigley had apparently unsuccessfully attempted to complete his GED. (Tr. 187.)

Greer stated that Quigley's intelligence and achievement test results revealed evidence of borderline intellectual functioning, functional illiteracy, and innumeracy. (Tr. 188.) Greer commented that Quigley's Verbal Comprehension score of 91 on the WAIS-III test confirmed his "fairly adequate verbal expressivity." (*Id.*) Greer then noted that "[Quigley's] Working Memory Index is estimated at 69, and the Processing Speed Index at 79, the former suggesting diminished attentiveness, a feature potentially associated with limited ability, seizure disorder

itself, or sedating medication effects." (*Id.*) Greer remarked that "the likelihood of being able to manage a business independently is extremely suspect" with functional illiteracy and innumeracy, which he explains are "functional capabilities at less than 6th grade attainment." (*Id.*)

In Quigley's personality assessment, Greer found that, other than some stress and significant diminution in self-confidence, there was no evidence that Quigley had a major depressive process. (Tr. 189.) Greer questioned the use of Effexor under such circumstances, stating that it "appear[ed] to be unmerited and potentially problematic." (*Id.*)

Once the summary indices of the neuropsychological functions test were properly adjusted for Quigley's age and education, Greer noted that the test results "demonstrate[d] only mild neuropsychological impairment, without any clear evidence of cortical involvement." (Tr. 190.) Greer then commented:

> Weak constructions efforts on the [Aphasia Screening Test] and very poor visual-analytic performances on WAIS-III Block Design and Matrix Reasoning suggest problems with feature analysis that implicate right temporal [cerebral] lobe dysfunction, beyond the numerous elevations in the profile that seem to be a direct outgrowth of [Quigley's] innumerate and illiterate status (the very poor performances on WAIS-III Arithmetic and Digit Symbol, reading and spelling errors on the AST, ignoring the printed words as aides on the WAIS-III Vocabulary subtest, even difficulty remembering the alphabet demonstrated in his performance on Trailmaking).

(*Id.*) Based on Quigley's scores on the NAB-M, Greer remarked that Quigley had "relatively adequate verbal expressive and verbal memory skills." (Tr. 191.)

Overall, Greer diagnosed Quigley with: (1) a mood disorder due to general medical condition, with depressive features; (2) academic problems, functional illiteracy, and innumeracy; (3) borderline intellectual functioning; (4) narcissistic and compulsive

personality traits; and (5) a general medical condition of complex partial seizure disorder, idiopathic type, relatively well controlled with medication. (*Id.*) Greer determined that Quigley had a Global Assessment of Functioning ("GAF")[4] score of 50.[5] (*Id.*)

Quigley visited Liu again in January 2008, and Liu recommended that Quigley continue to take 75 milligrams of Effexor per day for his depression. (Tr. 208.) Responding to an interrogatory from Quigley's attorney dated January 15, 2008, Liu indicated that, considering Quigley's seizures and depression, a psychological evaluation was needed to assess Quigley's ability to perform basic work activities with regard to: dealing with stress, thinking or concentrating, persistence and pace of work, and completion of eight-hour work days on a dependable, ongoing basis. (Tr. 205-06.) Liu then suggested that Quigley's symptoms could be expected to interfere with his social functioning. (*Id.*) Additionally, Liu found that Quigley needed to rest more than 33% of the time during the day, and that he would occasionally miss work due to fatigue. (*Id.*)

C.    Administrative Hearing

In his opening comment at the hearing on July 8, 2008, Quigley's attorney focused solely on Quigley's seizures and related problems. (Tr. 30-31.) Quigley then testified that he was thirty-seven years old and that he lived in a house with his spouse and his two children. (Tr. 31-32.) He remarked that he had attempted to get a GED in 2007 but quit attending school after five

---

[4] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) ("DSM-IV").

[5] A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

months due to profound depression. (*Id.*) He further explained that, when trying to complete his GED, there were days when he did not get out of bed and had thoughts of hopelessness. (*Id.*)

With regard to his depression, Quigley noted that he took 75 milligrams of Effexor. (Tr. 34.) The ALJ asked Quigley when he started taking Effexor. (*Id.*) Quigley did not answer the question right away and remarked that he was having a hard time concentrating. (*Id.*) He then stated that he wrote it all down and told the ALJ that he started taking Effexor about a year ago. (*Id.*) He commented that he wanted to upgrade the dosage of his Effexor and stated that he had mentioned it to Liu at his last visit about six months ago. (Tr. 36-37.)

Quigley further testified that he last worked from August 2007 to September 2007 as a forklift driver. (Tr. 32-33.) He reported that he missed two days of the job's 90-day probation period because of seizures. (Tr. 33.) He stated that he could no longer work due to "constant ringing in [his] ear," problems with disorientation and concentration, swelling in the back of his neck, and vertigo. (*Id.*) He noted that he also had tremors occasionally and that his seizure medicine left him fatigued. (*Id.*) Quigley also stated that prior to his work as a forklift driver, he worked as a men's clothing salesperson 40-hours a week from October 2006 to March 2007. (Tr. 34-35.) He stated that he quit because his anxiety over conflict with a supervisor had caused him to have three seizures in a row. (Tr. 34.)

Quigley reported that since he had been out of work, he tended to his house during the day by taking care of his daughters and doing housework. (Tr. 35-36.) Additionally, he stated that he tried to start a clothing business. (Tr. 35.) He commented that it did not work out because of his depression. (*Id.*) He explained that he registered his business with the State of Texas and spent six hours a day online trying to generate an income by buying and selling

clothes online. (Tr. 35-36.) He noted, however, that he had not made any profit. (Tr. 35.) Quigley then remarked that he stayed in bed all day about three times a week due to his depression. (Tr. 36.) When asked by the ALJ what else he did during the day, Quigley responded that he "read magazines and things to keep [his] brain functioning." (Tr. 37.)

Quigley's attorney had Quigley describe several of his seizure episodes in detail. (Tr. 38-40.) Quigley's attorney then questioned Quigley's wife, Tiwana Belle Quigley, who offered further testimony concerning Quigley's seizures. (Tr. 41-44.)

Mr. Taylor ("Taylor"),[6] a vocational expert ("VE"), also testified at the hearing. (Tr. 44-47.) In summarizing Quigley's past relevant work, Taylor described: (1) Quigley's job as a men's clothing salesperson as light, semi-skilled work with a specific vocational preparation ["SVP"][7] of four; (2) his job as a furniture mover job as very heavy and unskilled work; (3) his job as an automobile salesperson as light, skilled work with a SVP of six; (4) his job as a forklift operator as medium, semi-skilled work with a SVP of three; and (5) his job as a dairy department manager as medium, skilled work with an SVP of five. (Tr. 44-45.) The ALJ asked Taylor to consider whether a person of the same age, education, and vocational history as Quigley could perform any of the past relevant work that he performed, either as he actually performed it or as it is customarily performed in the national economy, if that person had the following limitations:

---

[6] The Court cannot locate Taylor's first name in the record.

[7] The SVP level refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. *See* Dictionary of Occupational Titles ("DOT"), App. C (rev. 4th ed. 1991). Unskilled work usually requires less than thirty days of training, which corresponds to an SVP level of 1 or 2; semi-skilled work corresponds to an SVP level of 3 or 4; and skilled work requires an SVP level of 5 or higher. Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000). *See generally* 20 C.F.R. § 404.1568.

[1] Lift and carry occasionally 50 pounds, lift and carry frequently 25 pounds, stand and walk about 6 hours in an 8-hour day, and sit about 6 hours in an 8-hour day.

[2] No climbing of scaffolds, ropes or ladders, no balancing, frequent kneeling, crouching, crawling and stooping, no manipulative limitations.

[3] No visual or communication limitations, no work in excessive heat, no work around hazardous moving machinery, no work at unprotected heights, and normal seizure precautions, including no work around open flames, open bodies of water, and no driving during work . . . for employment purposes.

(Tr. 45-46.) Taylor testified that Quigley would still be able to perform his past work as a men's clothing salesperson, an automobile salesperson, and a dairy department manager, as the jobs are customarily performed in the national economy. (Tr. 46.) He further stated that each job would require forty-hours per week. (*Id.*) In response to a question from Quigley's attorney, Taylor indicated that most employers would not tolerate an employee taking more than one to two days per month sick leave on a consistent basis. (Tr. 47.) Quigley's attorney then asked the ALJ in his closing comment to consider that the frequency of Quigley's seizures will impair his ability to meet these attendance requirements. (*Id.*)

D.    The ALJ's Decision

In reaching his decision, the ALJ performed the five-step sequential evaluation process for determining whether a person is disabled. (Tr. 12-20.) At step one, the ALJ found that Quigley was fully insured from the time he alleged his disability began through June 30, 2012. (Tr. 12.) The ALJ also found that Quigley had not engaged in substantial gainful activity since March 15, 2006. (*Id.*) At step two, the ALJ determined that Quigley had the following "severe" combination of impairments: a seizure disorder, depression, a mood disorder due to a general

medical condition, illiteracy, innumeracy, borderline intellectual functioning, and narcissistic and compulsive personality traits. (*Id.*)

At step three, the ALJ determined that none of the impairments that he had found to be severe, either singly or in combination, met or equaled the criteria of any of the impairments in the Listing. (Tr. 13.) He then, in a thorough discussion consisting of seven pages of single-spaced text, analyzed Quigley's testimony from the hearing and his medical records from Liu and Greer. (Tr. 13-19.) He also found that Quigley's subjective complaints were not credible, stating they were inconsistent and not reasonably supported by the evidence in the record. (Tr. 14.) The ALJ did not give great weight to the GAF score assessed by Greer, explaining that the GAF score was "inconsistent with the examination findings" and Greer inappropriately "took into account Mr. Quigley's physical and environmental circumstances in arriving at the score." (Tr. 18.) The ALJ also discounted Liu's recommendation in January 2008 that Quigley needed a psychological assessment, noting that Greer performed a detailed neuropsychological assessment of Quigley in May and June 2007. (Tr. 17.) Based on the evidence in the record, the ALJ found that Quigley had the following RFC:

> Lift and carry 50 pounds occasionally; lift and carry 20 frequently; stand and walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; never climb ladders, scaffolds, ropes, or balance; can frequently kneel, crouch, crawl, and stoop; no exposure to excessive heat; no work around hazardous moving machinery; and no work at unprotected heights. He must follow normal seizure precautions, such as no work around open flames or bodies of water, and no driving for work purposes. He has no manipulative or visual/communicative limits. He can understand, remember, and carry out detailed instructions, and make judgments on detailed work-related decisions.

(Tr. 13.) The ALJ stated that "Quigley [could] work at this residual functional capacity on a sustained, full-time basis and maintain employment for an indefinite period of time." (*Id.* (citing

*Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), and *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986)).)

Based on the VE's testimony, the ALJ determined at step four that Quigley was capable of performing his past relevant work as a salesperson and as a dairy department manager. (Tr. 20.) The ALJ then concluded that Quigley had not been disabled within the meaning of the SSA at any relevant time through the date of the decision. (*Id.*)

## V. DISCUSSION

A. Whether the ALJ's RFC assessment that Quigley had no communicative limitations is supported by substantial evidence.

Quigley argues, in essence, that the ALJ did not adequately weigh the results of Quigley's psychological testing in determining in his RFC assessment that Quigley did not have any communicative limitations. (Plaintiff's Brief ("Pl. Br.") at 5-6.) Quigley contends that his poor performance on tests that involved reading, working memory, and processing speed is evidence of his limited ability to exercise independent judgment, make decisions, and communicate with people. (*Id.*)

RFC is what an individual can still do despite his limitations.[8] SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id. See Myers v. Apfel*, 23 8F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment is a function-by-

---

[8] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

function assessment, with both exertional and nonexertional factors to be considered, and is based upon all of the relevant evidence in the case record. *Id.* at *3-5. The responsibility for determining a claimant's RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7. In making an RFC assessment, the ALJ must consider all the symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p, 1996 WL 374184, at *5. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), superseded by SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

The ALJ considered the hearing testimony and Quigley's medical records in determining that Quigley had no communicative limitations. (*See* Tr. 13-19.) Specifically, the ALJ considered the following:

> (1)    medical records showing Liu prescribed Effexor to Quigley in April 2007 after Quigley indicated that he had symptoms of depression (Tr. 18);

> (2)    subsequent treatment records from Liu did not indicate Quigley reported having significant depression or mental symptoms (Tr. 19);

> (3)    Greer's finding that Quigley had a GAF score of 50 (Tr. 18);

13

(4) Greer's statement when evaluating Quigley's memory and processing abilities that Quigley's test results "suggested diminished attentiveness" (Tr. 19);

(5) Greer's finding that Quigley was, nevertheless, "alert, fully oriented, socially appropriate, and seemingly capable of social judgment" with no signs of "cognitive deterioration" (Tr. 18);

(6) Greer's conclusion that "the data did not suggest any additional neuropsychological deficit beyond what would be expected with borderline intellectual functioning and the *modest* impact of the seizure disorder upon general psychomotor speed, attention, and memory" (*Id.*);

(7) Greer's conclusion that Quigley's processing capabilities did not appear to dramatically decline as a result of his seizure disorder and that Quigley had adequate verbal expressivity, fluency, and memory (Tr. 18-19);

(8) Greer's statement that Quigley was "exceptionally slow in completing any test that involved reading" (Tr. 19);

(9) Greer's conclusion that Quigley's test scores showing that he read at the fourth grade level and could spell at the third grade level revealed evidence of functional illiteracy and numeracy (*Id.*);

(10) Greer's opinion that Quigley could work in a sales or retail position (Tr. 18);

(11) Greer's finding that Quigley's personality assessment was entirely within normal limits and, while he experienced some stress, nothing suggested a major depressive process (Tr. 19);

(12) Greer's finding that there "was very little data that could not be explained by borderline intellectual functioning and associated functional illiteracy and innumeracy" (Tr. 19); and

(13) Quigley's testimony that he read magazines during the day and spent six hours a day online trying to sell men's clothing (Tr. 14-15, 18).

Based upon this and other evidence in the record, the ALJ then concluded that Quigley had no visual or communicative limits and that he can "understand, remember, and carry out detailed instructions, and make judgments on detailed work-related decisions." (Tr. 13; *see* Tr.

19.) Although there is, arguably, conflicting evidence in the record regarding Quigley's communicative limits, the Court concludes there is substantial evidence supporting the ALJ's decision on this issue. In short, the ALJ's decision acknowledges and weighs the conflicting evidence but, ultimately, based heavily on Greer's findings regarding his verbal skills, determined that Quigley has no communicative limits. An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence also supports the conclusion that was reached by the ALJ. *Dollins v. Astrue*, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citations omitted). Because the ALJ's determination that Quigley had no communicative limitations is supported by substantial evidence, remand is not required.

Additionally, it is significant that Quigley was able to perform his past relevant work for years despite his illiteracy and innumeracy. *See Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (holding that the ability to work for several years while suffering from impairments the claimant now asserts are disabling is evidence that the condition is not disabling). *See also* 20 C.F.R. § 404.1564 ("Past work experience and the kinds of responsibilities you had when you were working may show that you have intellectual abilities."); *Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987). Quigley does not argue, and there is no evidence to indicate, that Quigley's illiteracy and innumeracy increased over time due to his seizure disorder or any other impairment.

Quigley seems to suggest that it was, in essence, inconsistent for the ALJ to find at step two that Quigley's severe combination of impairments included illiteracy and innumeracy, and to then find that Quigley had no communicative limitations. (*See* Pl. Br. at 7.) The Court,

however, notes that "having a severe impairment is not a sufficient condition for receiving benefits under the Secretary's regulations," but "means only that claimant has passed the second step of the inquiry mandated by the regulations." *Shipley v. Sec. of Health & Human Servs.*, 812 F.2d 934, 935 (5th Cir. 1987). In other words, the consideration of whether a claimant's impairments are severe at step two is a different inquiry than an ALJ's assessment of the claimant's RFC. *See Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001) ("The ALJ's finding that [the claimant] had a 'combination of impairments that is severe' did not foreclose a finding that [the claimant] had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."); *Gutierrez v. Barnhart*, No. 04-11025, 2005 WL 1994289, at *9 (5th Cir. Aug. 19, 2005) ("A claimant is not entitled to social security disability benefits merely upon a showing that she has a severe disability. Rather, the disability must make it so the claimant cannot work to entitle the claimant to disability benefits."). Thus, the ALJ's step two determination that Quigley had a severe combination of impairments including illiteracy and innumeracy is not necessarily inconsistent with his RFC determination that Quigley had no communicative limitations.

B. Whether the ALJ's determination at Step Four that Quigley can perform his past relevant work is supported by substantial evidence.

Quigley argues that the ALJ's determination that Quigley could return to his past relevant work is unsupported by substantial evidence because the ALJ failed to instruct the VE to consider an illiterate worker. (Pl. Br. at 7.) Quigley contends that, since his education was not properly explained, the ALJ relied upon the VE's testimony in response to a defective hypothetical question. (*Id.*) Quigley comments that the lowest reasoning level indicated in the

Dictionary of Occupational Titles ("DOT") for the clothing store sales jobs and grocery store clerical and managerial jobs is a reasoning level of two ("R2"), which requires an ability to read. (*Id.* at 6.)

In addition, Quigley asserts that the ALJ failed to adequately weigh the evidence to determine whether Quigley retained the RFC to perform the actual duties of his past relevant work. (Pl. Br. at 1 (citing SSR 82-61 and SSR 82-62).) Specifically, based on Quigley's testimony that he quit his last job due to seizures brought on by anxiety over conflicts with his supervisor, Quigley contends that the ALJ should have found that his anxiety was not compatible with the actual duties of his past relevant work. (Pl. Br. at 4-5 (citing SSR 82-62).) In addition, Quigley argues that the ALJ failed to consider whether Quigley's combination of severe impairments were compatible with the stress of his past work. (Plaintiff's Reply Brief ("Pl. Rep. Br.") at 3 (citing SSR 82-62).) Quigley states that, in light of his poor psychological test scores, ordering product as a dairy department manager would be stressful, as it requires him to "exercise independent judgment, make decisions, and communicate with people." (Pl. Br. at 6.)

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions." *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (citing *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id.* The ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's

residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). If the ALJ's hypothetical fails to incorporate all such functional limitations, the ALJ's determination is not supported by substantial evidence. *Id.* A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). When the ALJ includes all disabilities supported by the evidence and provides Plaintiff's counsel the opportunity to correct the hypothetical question and suggest additional disabilities not recognized by the ALJ's findings, the VE's answer to the hypothetical question can provide substantial evidence supporting a denial of such benefits. *See Bowling*, 36 F.3d at 436. Furthermore, a claimant's vocational factors of age, education, and work experience play no role in the step four determination of whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience . . . .")

A claimant can perform his past relevant work if he retains the RFC to perform either: "[1] the actual functional demands and job duties of a particular past relevant job; *or* [2] the functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61, 1982 WL 31387, at *2 (S.S.A. 1982) (emphasis in original). *See Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987); *Flores v. Astrue*, No. 3:09-CV-1487-B, 2009 WL 1321684, at *2 (N.D. Tex. May 12, 2009). Furthermore, "for a

claim involving mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with such work." SSR 82-62, 1982 WL 31386, at *3 (S.S.A. 1982).

In this case, the ALJ determined that Quigley had the RFC to lift and carry fifty pounds occasionally and 20 pounds frequently; sit, stand and walk about six hours in an eight-hour workday; never climb ladders, scaffolds, ropes, or balance; frequently kneel, crouch, crawl, and stoop; no exposure to excessive heat; no working around hazardous moving machinery; no working at unprotected heights; must follow normal seizure precautions; no manipulative or visual/communicative limits; understand, remember and carry out detailed instructions and make judgments on detailed work-related decisions; and respond appropriately to supervision, coworkers, and work pressures. (Tr. 13.)  Based upon this RFC, the ALJ found that Quigley was capable of performing his past relevant work as a sales person and dairy department manager. (Tr. 20.) In making this determination, the ALJ relied on the testimony of Taylor, the VE at the third hearing before the ALJ.[9]  The ALJ asked the VE to consider the following hypothetical:

> [A]n individual the same age, education and vocational history of the
> Claimant . . . that had the following limitations.

---

[9] In the Fifth Circuit, consideration of vocational factors, including the testimony of a VE, is permissible but not required at Step Four of the evaluation process under 20 C.F.R. § 404.1560(a). *See Thomas v. Shalala*, 56 F.3d 1385, 1995 WL 337785, at *2 (5th Cir. 1995).

Lift and carry occasionally 50 pounds, lift and carry frequently 25 pounds, stand and walk about 6 hours in an 8-hour day, and sit about 6 hours in an 8-hour day.

No climbing of scaffolds, ropes or ladders, no balancing, frequent kneeling, crouching, crawling and stooping, no manipulative limitations.

No visual or communication limitations, no work in excessive heat, no work around hazardous moving machinery, no work at unprotected heights, and normal seizure precautions, including no work around open flames, open bodies of water, and no driving during work, for work, for employment purposes.

Would be able to understand, remember and carry out detailed, but not complex instructions, and would be able to respond appropriately to supervision, co-workers, and usual work pressures in a detailed work-related environment.

(Tr. 45-46.)

Based on this hypothetical, the VE testified that Quigley was capable of performing his past relevant work as a sales person and as a dairy department manager as they were customarily performed in the national economy. (Tr. 20; *see* Tr. 46.) The VE, prior to reaching this ultimate conclusion, analyzed the exertional level and skill level of each job performed. Specifically, the VE stated, "[A] men's clothing sales person, light semi-skilled, SVP 4, a furniture mover, very heavy, unskilled, and automobile sales person, light, skilled, SVP 6, and a forklift operator, medium, semi-skilled, SVP 3. . . . Dairy Department Manager, would in a grocery is [sic] medium, skilled, SVP 5." (Tr. 44-45.)

In the hypothetical question that the ALJ asked the VE, the ALJ properly incorporated all the functional limitations that he had determined in his RFC assessment into the hypothetical question. (*Compare* Tr. 13 *with* Tr. 45-46.) *See Savage v. Barnhart*, 372 F. Supp. 2d 922, 931 (S.D Tex. 2005) ("[The claimant] is mistaken by his assertion that the ALJ's hypothetical question to the VE was flawed because it did not incorporate the issue of literacy, a non-

exertional impairment. Illiteracy is not a nonexertional impairment but . . . is one level of education.") (citing 20 C.F.R. § 404.1564(b)(1)). The ALJ also provided Quigley's counsel with the opportunity to correct the question and suggest additional disabilities not recognized by the ALJ findings. (*See* Tr. 47.) Thus, the Court finds that the ALJ's determination that Quigley could return to his past relevant work is supported by substantial evidence.

Because the ALJ relied upon the VE's testimony at Step Four of the disability analysis, the ALJ did not err by failing to fully develop Quigley's educational level in the hypothetical question that he presented to the VE. 20 C.F.R. § 404.1560(b)(3). The ALJ did not issue any RFC limitations concerning Quigley's illiteracy and innumeracy, and the Court has found that the ALJ's determination that Quigley had no communication limitations is supported by substantial evidence. Therefore, the ALJ did not err by failing to incorporate reading limitations into the hypothetical question. The Court also notes that the DOT reasoning requirements for jobs with a reasoning level of R2 state that the worker must be able to "carry out detailed but uninvolved written or oral instructions," which is very similar to the limitations the ALJ included in his RFC assessment and the hypothetical to the VE. *Compare* DOT, App. C (Rev. 4th ed. 1991) *with* Tr. 13.

Because the ALJ determined that Quigley retained the RFC to perform his past relevant work as a salesperson and a dairy department manager as the jobs are generally performed in the national economy, the ALJ did not need to determine whether Quigley retained the RFC to perform the actual duties of his past relevant work. *See* SSR 82-61, 1982 WL 31387, at *1-2. The ALJ relied on the VE's testimony in determining at Step Four that Quigley was capable of performing his past relevant work. The VE, as evidenced by his testimony regarding the skill

and exertional levels of Quigley's past relevant work, had researched the job data in the DOT and was aware of the requirements of the various jobs as performed in the national economy. Consequently, the Court concludes that the ALJ did comply with SSR 82-61.

As to the issue that the ALJ failed to perform an evaluation of the effects of Quigley's anxiety, Quigley suggests that he cannot perform his past job duties because working with others causes him anxiety, which triggers seizures. (*See* Pl. Br. at 5.) However, Quigley has not pointed to any evidence in his medical records where he complained of anxiety. (*See, e.g.*, Tr. 151-92, 208.) Unsurprisingly, the ALJ did not find that Quigley was impaired by anxiety or limited in his social interactions due to anxiety. (*See* Tr. 12.) *See* 20 C.F.R. § 404.1528(a) (stating that "[a claimant's] statements alone are not enough to establish that there is a physical or mental impairment").

Furthermore, the ALJ specifically considered Quigley's mental impairments when he found at Step Two that Quigley had the severe impairments of, *inter alia*, depression, a mood disorder due to general medical condition, illiteracy, innumeracy, borderline intellectual functioning, and narcissistic and compulsive personality traits. Moreover, the ALJ did acknowledge that Quigley had "3 seizures on back to back days [while working] due to anxiety" and that he experienced stress. (Tr. 13, 19.) The ALJ did not, however, based upon substantial evidence in the record, incorporate any such limitations relating to the mental impairments into his RFC determination. In fact, the ALJ specifically found in his RFC determination that Quigley could "respond appropriately to supervision, coworkers, and work pressures." (Tr. 19.)

22

Because the evidence indicates that the ALJ did consider the effects of Quigley's anxiety and stress on his ability to work, the Court finds that the ALJ satisfied SSR 82-62.[10]

Quigley also cites SSR 85-15 in support of his argument that the ALJ did not adequately evaluate the effect of Quigley's anxiety or other impairments. (Pl. Br. at 5.) SSR 85-15 provides that "the mentally impaired have difficulty accommodating to the demands of work and work-like settings" and emphasized the "importance of thoroughness in evaluation" of whether a particular claimant can adapt to the demands or stress of the workplace. SSR 85-15, 1985 WL 56857, at *5 (S.S.A. 1985). Quigley's reliance on SSR 85-15, however, is misplaced as the application of SSR 85-15 is limited to cases where the claimant has been found not disabled at step five. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995). In this case, Quigley was found not disabled at step four. Consequently, SSR 85-15 is not applicable.

RECOMMENDATION

For the foregoing reasons, the Court recommends that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate

---

[10] Even assuming that the ALJ could have provided a more in-depth discussion of the precise description of the particular job duties which are likely to produce tension and anxiety pursuant to SSR 82-62, any error is not prejudicial as there is no indication that the ALJ's determination would have changed had he done so. *See Pearson v. Barnhart*, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (stating that a violation of a SSR may "constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation")).

Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until September 28, 2010. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until September 28, 2010, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED September 8, 2010.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE